Filed 11/24/14  In re A.R. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.R., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>V.C., et al.<br><br>     Defendants and Appellants. | G049956<br><br>(Super. Ct. No. DP021169)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Andre Manssourian, Judge.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant Mother.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant Father.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

V.C. (Mother) and J.R. (Father) appeal from the order terminating their parental rights to their son, A.R. Father contends the juvenile court erred in summarily denying his Welfare and Institutions Code section 388 modification petition (hereafter section 388 petition),[1] and both parents contend the court should have applied the "parental benefit exception" to adoption. (§ 366.26, subd. (c)(1)(B)(i).) We find no errors, and we affirm the order.

FACTS AND PROCEDURE

In our prior opinion, *V.C. et al. v. Superior Court* (Dec. 19, 2013, G048961 [nonpub. opn.] (*V.C.*)), we affirmed the juvenile court's September 2013 order made at the 24-month review hearing terminating reunification services and scheduling a permanency planning hearing pursuant to section 366.26 (hereafter a section 366.26 hearing) for A.R.[2] Our prior opinion fully states the facts through the 24-month review hearing. We adopt and incorporate by reference the facts and analysis from our prior opinion and only summarize them here.

A.R. was detained at birth in April 2011 due to Mother's methamphetamine use during her pregnancy. Mother had already failed to reunify with two other children who had been subjects of dependency proceedings, and she had another child with whom she had had no contact for many years. Mother had an extensive primarily drug-related criminal history and a history of psychiatric hospitalization, and she had abused controlled substances since she was a teenager. Father similarly had an extensive criminal history, including felony drug-related and possession of firearms convictions, and several jail and prison sentences. (*V.C., supra,* typed opn. at pp. 2-3.)

---

[1]     All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2]     In our prior opinion, we referred to the minor with the initials "A.C." consistently with Mother's last name as used in the petition and early reports and orders. In later reports and orders, including the order on appeal, the minor is referred to by Father's last name. Accordingly we will utilize the initial's "A.R."

By June 2011, A.R. was placed in the concurrent planning home with the foster parents with whom he has lived throughout these proceedings and who are the prospective adoptive parents. Mother and Father had suffered another drug-related arrest. In August 2011, they pleaded no contest to the allegations of the petition, and A.R. was declared a dependent child. The court vested custody with the Orange County Social Services Agency (SSA) and adopted case plans for both parents. (*V.C., supra,* typed opn. at p. 4.)

By the six-month review hearing, the parents were living with the paternal grandmother and participating in services. Mother was regularly drug testing, with no positive or missed tests. Father regularly drug tested, but his drug tests were consistently positive for methadone, which caused the social worker concern about Father's progress. Neither parent had begun comprehensive drug counseling and treatment programs. The parents were having regular monitored visitation with A.R. that went well. A.R. was developing well and was bonded to his foster parents. The parents stipulated to the findings made at the six-month review hearing, which included findings that return of A.R. created a substantial risk of detriment and reasonable services had been provided. (*V.C., supra,* typed opn. at p. 5.)

A 12-month review hearing was originally set for August 2012. After numerous continuances, it finally took place in October 2012 by which time it was a combined 12-month/18-month review hearing. (*V.C., supra,* typed opn. at pp. 5, 8.) SSA had initially recommended terminating reunification services and setting a section 366.26 hearing. In June 2012, Mother and Father had been arrested at their residence and drug paraphernalia and weapons were found. Father's probation was revoked and he was incarcerated. Mother served 16 days for violating probation but remained on probation. SSA restricted visitation. (*V.C., supra,* typed opn. at pp. 5-7.) But by October 2012, when the combined 12-month/18-month review hearing took place, the social worker reported Mother was making significant progress with her case plan including substance

abuse services. She had regular visits with A.R. that had been liberalized to unmonitored, and the social worker was contemplating allowing overnight and weekend visits. The social worker thought Mother could reunify with A.R. if services were extended for another six months. The parents stipulated to findings including that return of A.R. to the parents posed a risk of detriment and reasonable reunification services had been offered. The juvenile court ordered an additional six months of reunification services because Mother was progressing in substance abuse services and there was a substantial probability A.R. could be returned to Mother's physical custody within that time. It set a 24-month review hearing for April 2013.[3] (*V.C., supra,* typed opn. at pp. 5-8.)

By January 2013, Mother's visits with A.R. were liberalized to eight hours a week unmonitored, and she subsequently began having overnight visits. The foster parents reported A.R. was becoming resistant to leaving for visits with Mother. Father was about to be released from jail, and Mother said she intended to live separate from Father to prevent his interference with her reunification. A 60-day trial visit was scheduled for the end of February. (*V.C., supra,* typed opn. at pp. 8-9.)

The social worker specifically told Mother and Father that Mother must not allow Father to have access to A.R. during her unmonitored visitation or during her 60-day trial visit and if she did so, the trial visit could fail. Despite this, right before the scheduled 60-day visit, Mother and Father arranged for Father to meet Mother on one of her unmonitored visits with A.R. Following this event, both parents' visitation was reduced to two hours, twice per week, monitored. (*V.C., supra,* typed opn. at pp. 8-10.)

---

[3]     In our prior opinion, we noted it was inappropriate for the juvenile court to extend reunification services to 24 months. There is a 12-month statutory limit on reunification services for a very young child. (§ 361.5, subd. (a)(1)(B).) Moreover, Mother's progress in substance abuse services was not the equivalent of being a parent in a court-ordered residential substance abuse program under section 366.22, subdivision (b), which might have qualified her for additional services. (*V.C., supra,* typed opn. at pp. 26-27, fn. 2.)

4

In April 2013, SSA recommended reunification services be terminated and a section 366.26 hearing be set. The parents had twice weekly monitored visitation that was consistent and positive. Mother and Father were participating in services. A.R. continued to do well in his placement, was bonded to his foster parents, and was developing normally. Although A.R. had been referred to therapy when Mother was having extended unmonitored visits, once her visitation with him was reduced to four hours per week monitored, his post-visit negative behaviors subsided and therapy was no longer needed. (*V.C., supra,* typed opn. at pp. 10-11.)

At the 24-month review hearing, the social worker testified that although Mother continued participating in her services, there was concern about her ability to protect A.R. and her poor judgment. Father had not yet completed his case plan, and he and Mother deliberately disregarded directions regarding Mother's visits knowing the consequences of violating those orders. The parents continued monitored visits, and the monitor's notes indicated there were no concerns. (*V.C., supra,* typed opn. at pp. 11-12.)

Mother testified she did not think the unauthorized visit placed A.R. in any danger. She never considered the possibility A.R. would experience any renewed loss if she was caught allowing unauthorized visits with Father. She denied having a drug problem and was not concerned about a relapse. Mother was still unemployed and she looked to the maternal grandmother for financial support. (*V.C., supra,* typed opn. at p. 13.)

Father testified he had begun a substance abuse program in May 2011, but could not complete it because of his arrest and incarceration. He did not participate in services while in custody. Father was unemployed, living with the paternal grandmother, and supported by her. He denied having a current addiction problem and had been sober for two years. (*V.C., supra,* typed opn. at p. 14.)

A visitation monitor testified as to Mother's positive visits with A.R. Mother was appropriate with the child, they interacted well, and A.R. appeared bonded

5

with Mother. A social worker who transported A.R. to visits and the foster mother testified A.R. generally got very upset when going to visits with Mother. When visits were increased, A.R.'s behaviors escalated. The foster mother testified that when visits were increased, A.R. began expressing anger at home, waking up screaming during the nights, and hitting the caretaker and the family dog. (*V.C., supra,* typed opn. at p. 15.)

At the conclusion of the 24-month review hearing, the court found reasonable services had been offered. It terminated services, scheduled a section 366.26 hearing, and ordered a bonding study between A.R., Mother, and the foster parents. It allowed Mother and Father continued supervised visits with A.R. (*V.C., supra,* typed opn. at pp. 18-19.)

*Post 24-Month Hearing—Section 366.26 Hearing & Section 388 Petition*

The section 366.26 hearing was set for January 6, 2014. In its first report, SSA reported A.R. remained with the foster parents with whom he had lived his entire life and who wanted to adopt him. A.R. and his foster parents had a "strong relationship," and he was fully integrated into their lives. He was affectionate with them, turned to them for comfort, and looked to them for all his needs, and he was thriving in their care.

.        Mother and Father, who were no longer together, had separate monitored or supervised visits with A.R. twice weekly for two hours. The visits went well and both parents were described as routinely meeting evaluation categories including "parenting role, knowledge of the child's development, responding to the child's verbal and non-verbal signals, putting the child's needs ahead of their own, and showing sympathy toward the child." The section 366.26 hearing was continued to February 5, 2014.

On February 3, 2014, SSA reported on a home visit with A.R. at the foster parents' home. A.R. was described as "delightful, friendly, verbally interactive as well as physically interactive, healthy in appearance, clean, well dressed, and energetic." He had well developed social skills, and he and the foster mother interacted with ease and

6

pleasure. The foster mother stated A.R. no longer cried when he went on visits with the parents, and he loved the transporter who took him to those visits and was happy he would be seeing her too. The section 366.26 hearing was continued to February 19, 2014.

Father filed a section 388 petition seeking to modify the referral order and place A.R. in his custody. Father asserted the change in circumstances was that he had completed his case plan, had maintained regular and consistent visitation with A.R., and they had a bond. Father asserted A.R. would benefit because courts "recognize[] the benefits of returning the child after a parent addresses and corrects the issues that led to removal."

Father's section 388 petition was supported by his declaration. Father conceded he only became involved "in the late stages of [his] family reunification services" but had now fully completed his case plan. He completed an outpatient substance abuse program and drug tested weekly since April 2013, with negative results. He went to Narcotics Anonymous/Alcoholics Anonymous meetings twice a week, had completed a parenting program, an anger management program, and was attending therapy. Father now understood his poor judgment and had developed good judgment. Since September 2013 (when services were terminated) he had attended all visits with A.R. (except one due to having hernia surgery), and the visits went well. Father declared, "The bond between [A.R. and me] is strong. He has a love and a need for me that is shown at every visit. He hugs and kisses me and wants me to hold and cuddle him. I know that if he is taken from [me] permanently he will have emotional damage." Father declared A.R. had a similar bond with Mother and gave as an example that at one visit in December 2013, A.R. had a tantrum when it was time to leave and cried that he wanted to continue visiting Mother. Father attached copies of the visitation monitor notes from visits. Mother also filed a section 388 petition, but because she does not challenge its denial, we do not discuss it.

7

When the section 366.26 hearing began on February 19, 2014, the juvenile court first considered the section 388 petitions, which it summarily denied because the parents failed to make a prima facie showing. The court noted it was impressed by the progress the parents had made, and found they had shown changed circumstances. But it found they failed at the second prong because the petitions made no showing that granting the motions would be in A.R.'s best interests. "The evidence in the petition simply didn't suggest to this court that [A.R.] would be better off if the petitions were granted."

The court then proceeded with the section 366.26 hearing. The social worker testified the foster parents were not supportive of continuing contact between A.R. and the parents if A.R. was adopted by them. There were no written reports about visits with the parents after July 2013, but the social worker testified there were no reported concerns about those visits.

Father testified his participation in services had given him "a deeper understanding of [his] addiction[.]" At visits with A.R., A.R. called him "Daddy" or "Papa" and referred to the foster parents as "Daddy B[.] and Mommy N[.]" During visits, Father fed A.R., played games with him, and assisted him in using the bathroom. A.R. was very affectionate during visits. A.R. would say he missed Father and wanted to go home with him but would just say "okay" when told he could not go home with Father.

Father testified A.R. would talk about and ask about Mother during visits, and had a bond with her as well. A.R. would run to Mother and light up when he saw her, and call her "Mama" or "Mommy." Father believed if parental rights were preserved, A.R. would "grow up feeling more secure about himself, knowing that he's with his real mom and dad, real family."

Mother testified that for the past year she visited with A.R. twice a week for two hours per visit. At the beginning of visits, A.R. would yell, "Mommy, Mommy" and

8

run to her. He would cling to her neck and kiss her all over her face. He would ask Mother many questions and ask where she had been. During visits, Mother showed A.R. family pictures and videos on her cell phone, played with him, and brought him food and toys. He would look to her for comfort during visits. Mother testified A.R. was well-behaved, and she was able to gently redirect him for his occasional misconduct. Mother testified A.R. would not want to leave his visits, was very bonded with Mother, and sometimes threw tantrums at the conclusion of visits.

Mother testified she continued her drug treatment services after her reunification services were terminated because they were helpful. She felt A.R. would be harmed by ceasing contact with his natural parents and maintaining parental rights was in his best interest because he would "still be in our lives." She thought A.R. truly believed he had two mothers and two fathers.

Gerardo Canul was the psychologist who performed the court-ordered bonding study. The evaluation process involved briefly discussing the evaluation purpose and process with the parent (e.g., Mother and the foster parents), and then observing their engagement with A.R. during play and interaction activities. He conducted his session with the foster parents at his office. He wanted Mother's session to also be at his office so the structure would be the same, but Mother would not meet there, so they had their meeting at SSA's offices instead.

Canul testified as to A.R.'s relationship with the foster parents as follows: "[T]here was positive interaction. There was warmth. There was kindness. It was spontaneous. Spontaneous holding hands. Spontaneous physical affection. Appropriate structuring. Direction. It looks and it felt like it was a very natural relationship that has been there for quite a while." As to Mother, Canul observed her interact with A.R. for about an hour, and he spoke to her for about five minutes. Canul testified Mother truly loves A.R., but there was "something missing there." During the interview, Mother kept A.R. "firmly on her lap" and when Canul tried to redirect Mother as to the purpose of the

9

evaluation, there was no change. She insisted in using her cell phone to interact with A.R.

Canul noted A.R. derived "a mildly positive emotional benefit" from Mother in that she provided kindness and love for him. But that did not equate to being a parent who can protect their child physically, emotionally, and psychologically. Mother's interactions with A.R. did not entail "much of a conversation," whereas the foster parents had more social activity and eye contact with him.

Canul opined it would be harmful and stressful for A.R. to be removed from the foster parents. A.R. was used to them, attached to them, and identified them as his parents. Canul believed A.R. had "attached, bonded to the foster parents," and did not believe Mother's relationship with A.R. outweighed the benefits of adoption.[4]

Mother testified in rebuttal that Canul's assessment of her interaction with A.R. during their interview was inaccurate. She "interacted throughout the whole entire time" of the bonding study evaluation with A.R. Canul spent approximately 25 minutes observing her interaction with A.R., and 30 minutes discussing the case with her. The evaluation took place in a small office/conference room at SSA's offices, with a table and chairs basically filling room, and Canul would not move it to a playroom at the facility. But Mother agreed the evaluation took place at the SSA facility at her request and she could not say "it was an inappropriate location" for the evaluation.

The court found A.R. was adoptable and terminated parental rights. In considering whether the parental benefit exception applied, the parties stipulated Mother and Father had maintained regular and consistent visitation with A.R., and the court agreed the visitation prong had been met. In considering whether the benefits to A.R. of maintaining the parent/child relationship, the court observed it found Canul to be an

---

[4]     The court ultimately ruled Canul's written bonding study report was inadmissible hearsay but noted it had heard basically everything contained in the report via Canul's live testimony.

"entirely credible witness," and it resolved any inconsistencies in favor of his testimony. The court observed now three-year-old A.R. had lived his entire life with the foster parents, and although A.R. derived some benefit from his relationship with Mother and Father, the benefit was not such that it would outweigh the benefits of adoption.

DISCUSSION

1. *Father's Section 388 Petition*

Father contends the juvenile court erred by denying his section 388 petition without a hearing. He argues that because he made a significant and substantial change in his circumstances by completing all his services, and he maintained regular and positive visits with A.R., he made a prima facie case that returning custody to him was in A.R.'s best interests. We reject his contention.

Section 388, subdivision (a)(1), states in pertinent part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall . . . set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction." Section 388, subdivision (d), provides: "If it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . . the court shall order that a hearing be held and shall give prior notice . . . ."

"[I]f the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806 (*Zachary G.*).) "The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at

11

the hearing, would sustain a favorable decision on the petition." (*Ibid*.) When determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188-189.) We review a denial of a hearing on a section 388 petition for abuse of discretion. (*Zachary G., supra,* 77 Cal.App.4th at p. 808.)

Here, the juvenile court agreed Father had shown changed circumstances given the progress he had made in his services. But it found he had not made a prima facie showing granting the motion would be in A.R.'s best interests. "The evidence in the petition simply didn't suggest to this court that [A.R.] would be better off if the petition[] [was] granted."

We affirm the juvenile court's order and findings as well within the scope of its discretion. The record supports the conclusion that the facts alleged, if supported by credible evidence, would not sustain a favorable decision on the petition. (*Zachary G., supra,* 77 Cal.App.4th at p. 806.)

As the record reflects, in summarily denying Father's petition, the court was most concerned with A.R.'s best interests. "On the eve of a section 366.26 hearing, the child's interest in stability is the court's foremost concern, outweighing the parent's interest in reunification. Thus, a section 388 petition . . . must be directed at the best interest of the child. [Citations.]" (*In re Ramone R.* (20050 132 Cal.App.4th 1339, 1348-1349.) As our Supreme Court recognized in *In re Stephanie M.* (1994) 7 Cal.4th 295, 317, "[a]fter the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." Where the section 388

12

petition is not directed at the best interests of the child, denial of the petition without a hearing is appropriate. (*Ibid.* See also *In re Anthony W.* (2001) 87 Cal.App.4th 246, 251-252 [juvenile court properly denied section 388 petition without hearing where no showing in minors' best interests to return to parent's custody]; *In re Zachary G., supra,* 77 Cal.App.4th at p. 808 [same].)

Father's petition contained abundant evidence of his recent, and commendable, completion of his court-ordered services. But there was nothing in Father's section 388 petition that would have permitted the court to conclude A.R. could be safely placed in his custody. Although Father and A.R. had many visits that went well, those visits have never progressed beyond monitored and Father has never been A.R.'s caretaker outside of those visits. While Father routinely engaged in parental tasks during his monitored visits, he has never been able to assume a parental role in A.R.'s life. "Family Code section 7800 declares the welfare and best interest of a child is achieved '"by providing the stability and security of an adoptive home when those conditions are otherwise missing from [the child's life]."' [Citations.]" (*In re Ronell A.* (1995) 44 Cal.App.4th 1352, 1369.) "'The parent is given a reasonable period of time to reunify and, if unsuccessful, the child's interest *in permanency and stability takes priority*.' [Citation.]" (*Id.* at p. 1370.)

Father had approximately three years to reunify with A.R. Nevertheless, as he concedes, he did not begin to fully participate in his services until late in the game. As the court in *In re Marilyn H., supra,* 5 Cal.4th at page 310, observed, "Childhood does not wait for the parent to become adequate. [Citation.]" By the time Father filed his section 388 petition, A.R. had spent virtually his entire life with the foster parents to whom he was bonded. To remove him from the only secure, stable home he had ever known would have caused chaos and uncertainty in an already uncertain life. Under the circumstances presented in the record, the juvenile court did not abuse its discretion by

13

concluding Father did not make a prima facie case, and it appropriately denied his section 388 petition without an evidentiary hearing.[5]

## 2. *Parental Benefit Exception*

Mother and Father contend the trial court erred by not applying the parental benefit exception to termination of parental rights. We find no error.

At a section 366.26 hearing, the juvenile court determines a permanent plan of care for a dependent child, which may include: (1) adoption (necessitating the termination of parental rights); (2) guardianship; or (3) long-term foster care. (§ 366.26, subd. (c)(1), (c)(4)(A).) "If the dependent child is adoptable, there is strong preference for adoption over alternative permanency plans." (*In re S.B.* (2008) 64 Cal.App.4th 289, 297 (*S.B.*))

To avoid termination of parental rights and adoption, a parent has the burden of showing one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply. (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.) The exceptions permit the court, "in exceptional circumstances," "to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) The so-called parental benefit exception applies when there is "a compelling reason for determining that termination [of parental rights] would be detrimental to the child due to . . . the following circumstances: [¶] The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "The 'benefit' necessary to trigger this exception has been judicially construed to mean, 'the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child

---

[5] In view of this conclusion, we need not address Father's argument denial of a hearing when the petition makes a prima facie case is a violation of due process.

14

relationship in a tenuous placement against the security and the sense of belonging to a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.'"  (*In re J.C.* (2014) 226 Cal.App.4th 503, 528-529 (*J.C.*); see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

"A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence.  [Citation.]  It is not enough to show that the parent and child have a friendly and loving relationship.  [Citation.]  '"Interaction between [a] natural parent and child will always confer some incidental benefit to the child . . . ."'  [Citation.]  For the exception to apply, '*a parental* relationship is necessary[.]'  [Citation.]  '"While friendships are important, a child needs at least one parent.  Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent." [Citation.]'  [Citation.]"  (*J.C.*, *supra,* 226 Cal.App.4th at p. 529.)

We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child.  (*J.C., supra,* 226 Cal.App.4th at pp. 530-531; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)  The latter determination "calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. . . . "  (*J.C., supra,* 226 Cal.App.4th at p. 531.)

There is no dispute about the first prong of the parental benefit exception—the juvenile court found, and SSA concedes, Mother and Father maintained regular visitation and contact with A.R.  The question is therefore whether the juvenile

15

court abused its discretion in concluding the benefit of adoption outweighed maintaining the parent-child relationship. (§ 366.26, subd. (c)(1)(B)(i).) There was not an abuse of discretion.

Mother relies on the following evidence, which she contends compels a finding the parental benefit exception applies. Mother maintained regular and consistent visitation with A.R. from the time he was taken into protective custody at his birth in April 2011. By early 2013, Mother had worked her way up to weekend visits (five total) with by then almost two-year old A.R., and was going to have a trial 60-day visit, until her visitation was restricted due to her allowing Father an unauthorized visit with A.R. Thereafter, Mother maintained regular twice-weekly supervised visits that went well. At visits, A.R. referred to Mother as "Mama" or "Mommy" and he would "light up" when he saw her. Mother and A.R. were affectionate with each other during visits. A.R. would tell Mother he loved her. They interacted during visits, looked at pictures and videos on her cell phone, and played games. Mother would comfort A.R. and appropriately redirect him. At the end of visits, A.R. would be sad, ask Mother if she was going away for a long time, and say he did not want to leave. On some occasions, A.R. threw a tantrum when the visit was over. Mother and Father testified A.R. and Mother had a bond.

Father cites similar evidence concerning his visits with A.R., which began when Father got out of jail in early 2013, as demonstrating the benefit to A.R. of maintaining the parental relationship outweighed the benefits of adoption. Throughout 2013, Father had consistent twice-weekly visits with A.R., and was observed to maintain a parental role during those visits most of the time. He played appropriately with A.R., fed him, and helped with potty training. A.R. was affectionate with Father, expressed through hugs, kisses, and "I love you" comments. Sometimes at the end of visits, A.R. would ask to go home with Father.

Although the juvenile court agreed there was some bond between the parents and A.R., and he derived some benefit from their relationships, we cannot say it

16

abused its discretion in concluding it did not outweigh the benefits of adoption. "[A] successful parental benefit exception claim rests not on whether the parent/child contacts '"confer some incidental benefit to the child . . . ."' [Citation.]" (*J.C., supra,* 226 Cal.App.4th at p. 532.) The parents at best established they had pleasant contacts with a three-year-old child for whom neither has ever provided primary care or stood in a parental role. Although Mother had a very short period of unmonitored weekend visits, that quickly ended when she simply refused to follow the court's and SSA's directives. Thereafter, she did not progress beyond monitored visits. Father did not begin regular visits until A.R. was almost two years old, and he too never progressed beyond twice-weekly monitored contacts.

*In re Jerome D.* (2000) 84 Cal.App.4th 1200 (*Jerome D.*), and *In re Amber M.* (2002) 103 Cal.App.4th 681 (*Amber M.*), illustrate the compelling evidence necessary to establish the parental benefit exception. In *Jerome D.*, *supra*, 84 Cal.App.4th at page 1206, the child "seemed lonely, sad, and . . . 'the odd child out'" in his placement. He wanted to live with his mother and had enjoyed unsupervised night visits in her home. (*Id.* at pp. 1206-1207.) A psychologist opined the child and his mother "shared a 'strong and well[-]developed' parent-child relationship and a 'close attachment' approaching a primary bond." (*Id.* at p. 1207.) The court concluded keeping parental rights intact would prevent the child's "position as the odd child out in [placement] from becoming entrenched by a cessation of visits and the loss of his mother while [his half-siblings] continued to enjoy visits and remained [the mother's] children." (*Id.* at p. 1208.)

In *Amber M., supra,* 103 Cal.App.4th at page 690, the court reversed termination of parental rights where a psychologist, therapists, and the court-appointed special advocate uniformly concluded "a beneficial parental relationship . . . clearly outweigh[ed] the benefit of adoption." Additionally, two older children had a "strong primary bond" with their mother, and the younger child was "very strongly attached to

17

her." (*Ibid.*) If the adoptions had proceeded, the children would have been adopted in separate groups. (*Id.* at pp. 690-691.)

Here, neither parent demonstrated harm would have ensued from termination of parental rights similar to that demonstrated in *Amber M.* or *Jerome D.* At the permanency stage, the bond the child shares with the parent and the harm that might arise from terminating parental rights must be balanced against what is to be gained in a permanent stable home, and "it is only in an *extraordinary case* that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350, italics added.) The parental benefit exception will apply only where the parent has demonstrated the benefits to the child of continuing the parental relationship outweigh the benefits of permanence through adoption.

Mother's and Father's reliance on *S.B.*, *supra,* 164 Cal.App.4th 289, is misplaced. There, the juvenile court found father had maintained consistent and appropriate visitation with his daughter throughout the dependency proceedings and they shared an emotionally significant relationship. (*Id.* at p. 298.) The father had been the minor's primary caretaker for three years and the record showed she "loved her father, wanted their relationship to continue and derived some measure of benefit from his visits." (*Id.* at p. 301.) An expert who had conducted a bonding study of father and daughter testified that, due to their "'fairly strong'" bond, "there was a potential for harm to S.B. were she to lose the parent-child relationship." (*Id.* at pp. 295-296.) The appellate court concluded that "[b]ased on this record, the only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with [the father]. [Citation.]" (*Id.* at p. 301.)

18

Here, there was no pre-existing parent-child relationship with Mother and/or Father and A.R. A.R. was taken into protective custody at birth due to Mother's drug use during pregnancy, and the parents' substance abuse and criminal histories. The parents have never acted as A.R.'s primary caregivers—he has lived with the foster parents for his entire life. During the early stages of the dependency proceedings, the parents suffered additional drug-related arrests and incarcerations that further prevented them from assuming parental roles for their son.

Although Mother points to her achieving increased visitation in early 2013, there was evidence the foster mother reported the increased visits caused emotional turmoil for A.R. He was resistant to leaving for visits with Mother and cried when he realized the foster parents were leaving at Mother's first overnight visit. He was referred to therapy, but once Mother's visits were again restricted to twice-weekly monitored, his negative reactions subsided and therapy was not necessary. The foster mother's reports were substantiated by the transport social worker.

While both parents, to their credit, completed their service plans, and developed warm relationships with their son, there was no testimony from a psychological expert or other disinterested person suggesting termination of parental rights would cause lasting detriment to A.R. by severing a strong bond. To the contrary, Canul testified A.R.'s bond to Mother provided only a "mildly positive emotional benefit." In contrast, Canul opined A.R. had a very strong bond with the foster parents who he identified as his parents and severing the bond with the foster parents would cause significant harm to him. As stated in *In re Jason J.* (2009) 175 Cal.App.4th 922 (*Jason J.*), the same appellate court that decided *S.B.*, "The *S.B.* opinion must be viewed in light of its particular facts. It does not, of course, stand for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." (*Jason J.*, *supra,* 175 Cal.App.4th at

19

p. 937; see also *J.C., supra,* 226 Cal.App.4th at pp. 529-530.) In sum, we cannot say the juvenile court abused its discretion by finding the parental benefit exception did not apply.

## DISPOSITION

The order of the juvenile court terminating parental rights is affirmed.


O'LEARY, P. J.

WE CONCUR:


ARONSON, J.


THOMPSON, J.